**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WAYNE JOHANSSON**, Plaintiff, v. **CENTRAL PROPERTIES, LLC** *et al.*, Defendants. | Case No. 17-cv-1656 (CRC) |

## MEMORANDUM OPINION AND ORDER

This case confirms that parties entering an employment relationship would be wise to spell out its terms in writing at the outset. Plaintiff Wayne Johansson worked for the real estate brokerage firm Central Properties, LLC, for approximately seven months last year. When relations soured, Johansson sued the company and its owner, Paul Sliwka, for unpaid wages. He claims he was promised a $60,000 annual salary for serving as the company's general manager, some of which he is still due. The firm begs to differ. In its telling, Johansson was hired to be no more than a commissioned sales agent and recruiter of other brokers, and he was never entitled to wages. It also contends that Johansson's claims must be arbitrated, rather than litigated in this court, due to a provision in an agreement that the company claims Johansson signed about halfway through his brief tenure.

After an initial round of briefing, the Court ordered limited discovery to sort out the facts surrounding Johansson's hiring and job responsibilities. The parties have completed that discovery and submitted supplemental briefs. Based on the expanded record, it clear to the Court that Johansson was not hired to perform typical general manager duties, that the parties entered into a written employment agreement containing an arbitration provision, and that this dispute

falls within the scope of that provision. The Court will therefore grant Central Properties' motion to compel arbitration and stay this case pending the conclusion of that process.

I. **Legal Standard**

In its supplemental briefing following discovery, Central Property moves for summary judgment and, alternatively, to compel arbitration. But that puts the cart before the horse. If the parties agreed to arbitrate Mr. Johansson's claims, then the merits of the claims are not properly before the Court. Giron v. Dodds, 35 A.3d 433, 437 (D.C. 2012). The Court will therefore begin (and end) by analyzing whether Johansson and Central Properties entered into an agreement to arbitrate their disputes and whether Johansson's claims here fall within the scope of any such agreement.

Under D.C. law, a written agreement to "submit to arbitration any existing or subsequent controversy arising between the parties to the agreement is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for the revocation of a contract." D.C. Code § 16-4406(a).[1] If a party to a suit makes a "showing that an arbitration agreement exists with respect to a particular issue, the trial court shall order the parties to arbitrate and stay the court

---

[1] The Court applies D.C. arbitration law rather than the Federal Arbitration Act ("FAA") since the relevant agreement here (which is further described below) specifies that disputes will be "decided by neutral binding arbitration in accordance with the District of Columbia Uniform Arbitration Act," Mem. P. & A. Supp. Defs.' Mot. Compel Arbitration Ex. A. See, e.g., Ford v. NYLCare Health Plans of Gulf Coast, Inc., 141 F.3d 243, 249 (5th Cir. 1998) (holding that identical language in contract referencing Texas law evinced the intent of the parties to displace the FAA with Texas arbitration law). Neither party contests that D.C. law, rather than the FAA, applies. While the agreement references the District of Columbia Uniform Arbitration Act ("DCUAA"), that act was repealed and replaced by the Revised Uniform Arbitration Act ("RUAA") effective July 1, 2009. See Giron, 35 A.3d at 437 n.1. The Court will accordingly apply the RUAA and its accompanying case law.

2

proceedings pending the outcome of arbitration." Giron, 35 A.3d at 437 (internal quotation omitted).

The question of "whether an agreement to arbitrate exists or a controversy is subject to agreement to arbitrate" is one for the Court to resolve. D.C. Code § 16-4406(b). In contrast, the question of "whether a contract containing a valid agreement to arbitrate is enforceable" is for the arbitrator and not the Court. Id. § 16-4406(c). D.C. law also adheres to the "severability" doctrine. See Menna v. Plymouth Rock Assurance Corp., 987 A.2d 458, 465 n.30 (D.C. 2010) (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444–46 (2006)). Under that doctrine, "even if 'another provision of the contract, or . . . the contract as a whole,' is invalid, unenforceable, voidable, or void, that 'does not prevent a court from enforcing a specific agreement to arbitrate.'" Lefoldt v. Horne, LLP, 853 F.3d 804, 815 (5th Cir. 2017) (quoting Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 70–71 (2010)) (alterations in original). Thus, unless an arbitration clause is itself being challenged, challenges to the contract writ large are for the arbitrator to resolve. Menna, 987 A.2d at 465 n.30.

The party seeking to compel arbitration first bears the burden of demonstrating that a valid agreement to arbitrate exists. See, e.g., Signature Technology Solutions v. Incapsulate, LLC, 58 F. Supp. 3d 72, 83 (D.D.C. 2014).[2] If such an agreement exists, the Court must then determine "whether the arbitration clause is susceptible of an interpretation that covers the dispute." Woodroof v. Cunningham, 147 A.3d 777, 787–88 (D.C. 2016) (internal quotation omitted). In other words, if there is a valid arbitration agreement, "a presumption in favor of

---

[2] The Court may rely on cases interpreting the FAA in construing the corresponding provisions of the RUAA as long as there is no "material difference" in the relevant statutory language. Giron, 35 A.3d at 438 n.3 (citation omitted).

arbitration attaches." 2200 M Street LLC v. Mackell, 940 A.2d 143, 151 (D.C. 2007) (citation omitted). The Court must require arbitration unless it has "positive assurance that the parties did not intend the dispute *sub judice* to be resolved through arbitration." Id. at 152 (internal quotation omitted). "[A]ny ambiguity is construed in favor of arbitration." Woodroof, 147 A.3d at 789.

## II. Analysis

Central Properties locates the parties' intention to arbitrate their disputes in an "independent contractor agreement" dated April 30, 2017 which appears to bear Johansson's signature. See Mem. P. & A. Supp. Defs.' Mot. Compel Arbitration Ex. A. The agreement provides that "[a]ny dispute or claim in law or equity between the Company and [Johansson] arising out of this Agreement will be decided by neutral binding arbitration . . . and not by court action." Id. ¶ 8. Central Properties argues that the parties knowingly entered into the independent contractor agreement, that the claims Johansson has raised here fall within the scope of the agreement's arbitration clause, and that the Court, under D.C. law, must enforce the agreement and stay the case. The Court agrees.

### A. Whether the parties entered into an agreement to arbitrate

While the parties bicker over precisely what duties Johansson was hired to perform, neither disputes that an employment relationship existed. The question is whether the parties intended for the independent contractor agreement, and in particular its arbitration clause, to govern that relationship. As noted above, the document bears what appears to be Johansson's signature. Johansson does not admit to signing it, but the facts developed in discovery do not raise a genuine factual dispute over whether the signature is his.

4

Again, Johansson started working at the company in January 2017. On Saturday, April 29, 2017, Paul Sliwka's brother Ben, who handles administrative matters for the company, informed Johansson by email that several documents were needed to complete his file. See Mem. P. & A. Supp. Def.'s Mot. Summ. J. Ex. P. Those documents included (1) a signed independent contractor agreement, (2) a signed policy statement, (3) a completed W9, (4) a job description, and (5) a copy of his license. Id. Johansson promptly responded that he would get Ben Sliwka the missing documents "first thing Monday." Id.[3] The signatures on the independent contractor agreement are dated the very next day: Sunday, April 30, 2017. Ben Sliwka further testified that he found the signed document on his desk Monday morning. B. Sliwka Dep. 141:20–142:18.

While Ben Sliwka's email to Johansson did not include any of these documents as attachments, discovery revealed that Johansson had easy access to them. There was ample testimony that printed copies of the independent contractor agreement and other documents were kept in a drawer with recruiting and marketing materials in the office. See, e.g., B. Sliwka Dep. 87:20–88:14; P. Sliwka Dep. 182:17–184:10; Mem. P. & A. Supp. Def.'s Mot. Summ. J. Ex. O ("Stallman Dep."), at 67:4–68:4. In addition, Johansson testified that he used several computers in the office, Johansson Dep. 38:11–20. Both Ben Sliwka and Central Properties employee Allison Stallman also testified that all staff members—including Johansson—had keys to the office. Stallman Dep. 13:4–12; B. Sliwka Dep. 19:6–11.

In sum, the record shows that the day before the independent contractor agreement was signed, Ben Sliwka asked Johansson to submit a signed agreement and Johansson said he would

---

[3] In his deposition, Johansson all but admits that he received this email from Ben Sliwka and that he sent the reply email. See Johansson Dep. 115:9–117:10.

return it first thing Monday. Johansson had access to copies of the agreement over the weekend. In addition, Allison Stallman identified this agreement as the standard one used by the company. Stallman Dep. 67:4–68:4. And Ben Sliwka testified that he was familiar with Johansson's signature and the one on the agreement "looked ordinary" to him. B. Sliwka Dep. 85:9–10. Finally, Ben Sliwka testified that he did not fabricate or falsify the agreement, id. 141:20–142:18, and there is nothing in the record to suggest otherwise. Based on this evidence, a reasonable jury could conclude that Johansson signed the agreement.

While Johansson does not acknowledge signing the agreement, he does not present sufficient evidence to create a genuine issue of fact on this point. In his deposition, Johansson consistently testified that he does not recall signing the agreement. See Johansson Dep. 136:16–138:19, 177:18–12. But he never affirmatively stated, in either his deposition or affidavits, that he did *not* sign it; he only states that he has no knowledge of how it was signed and does not admit he signed it. See Pl.'s Opp'n Defs.' Suppl. Br. Supp. Mot. Compel Arbitration Ex. 6 ("Supplemental Johansson Decl."), at ¶ 12. Thus, Johansson's testimony does not create a factual conflict with the circumstantial evidence: not recalling signing the document is perfectly consistent with having signed it. In the absence of any further evidence that Johansson did not sign the agreement, the Court concludes that there is no genuine issue of fact regarding whether he did so.[4] The Court thus concludes that Johansson and Central Properties entered into a written agreement to arbitrate.

---

[4] Johansson also makes much of inconsistencies in Paul Sliwka's testimony regarding who signed the independent contractor agreement on behalf of Central Properties. But the Court here applies a summary judgment standard. See, e.g., Wolff v. Westwood Management, LLC, 503 F. Supp. 2d 274, 278 (D.D.C. 2007). Under D.C. law, as under federal law, the Court does not weigh credibility on a summary judgment standard. See, e.g., Tolu v. Ayodeji, 945 A.2d 596, 601 (D.C. 2008). And Johansson cannot create a genuine issue of fact by "respond[ing]

B. <u>Whether the dispute falls within the scope of the arbitration agreement</u>

Since the Court has concluded that the parties entered into an agreement to arbitrate their disputes, a presumption of arbitrability attaches and Johansson must present "positive assurances" that his claims fall outside the scope of the arbitral agreement. <u>2200 M Street LLC</u>, 940 A.2d at 152. He has not done so.

In his opposition to Central Properties' initial motion to compel arbitration, Johansson maintained that he "only worked as Defendants' General Manager and his claims in this action exclusively address Defendants' failure to pay Plaintiff wages for General Manager work duties and Defendants' termination of Plaintiff from the position of General Manager." [ECF 10 at 2]. As the dispute was initially framed, then, the question whether Johansson's claims fell within the scope of the arbitration provision in the independent contractor agreement turned on whether that agreement was intended to cover the typical duties of a general manager. Discovery has now shown, however, that Johansson was not hired to perform those types of duties.

Rather, the record is undisputed that Johansson agreed to serve—and did in fact serve—as a recruiter of real estate agents for Central Properties. <u>See, e.g.</u>, Mem. P. & A. Supp. Def.'s Mot. Summ. J. Ex. E ("Johansson Dep."), at 92:5–10, 94:2–3, 133:5–7, 151:6–9; <u>id.</u> Ex. B ("P. Sliwka Dep."), at 99:1–7; <u>id.</u> Ex. A ("B. Sliwka Dep."), at 60:17–20. And while Johansson used the title "General Manager," he did so only as a strategy to enhance his ability to recruit agents. <u>See, e.g.</u>, Johansson Dep. 150:22–151:4; P. Sliwka Dep. 96:11–21; B. Sliwka Dep. 59:3–13;

---

simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could conclude" the facts are in his favor. <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 (1998); <u>see also</u> <u>Bradshaw v. District of Columbia</u>, 43 A.3d 318, 323 (D.C. 2012) ("The non-moving party cannot meet that burden and avoid summary judgment merely by impugning the honesty of the moving party's witness." (internal quotation and alterations omitted)).

Stallman Dep. 61:2–10. Johansson's own testimony confirms that he recruited other brokers and handled some administrative matters, but not much else. See, e.g., Johansson Dep. 118:8–119:5, 194:16–195:15. Johansson did not, for example, manage company operations or supervise employees, duties that one would typically associate with a general manager.

Admittedly, certain aspects of the parties' working relationship remain hotly contested. For one, the parties dispute whether Johansson's responsibilities included real estate sales as well as his recruiter duties. Johansson testified in his deposition that he never intended to be a real estate agent and told Paul Sliwka that from the start. Johansson Dep. 43:4–10. Sliwka, by contrast, says that Johansson agreed to serve as a real estate agent from the outset. P. Sliwka Dep. 77:15–78:11; see also B. Sliwka Dep. 95:3–8. The parties also dispute how Johansson was to be paid. Compare, e.g., P. Sliwka Dep. 94:20–95:95:18 with, e.g., Johansson Dep. 72:8–12.

With the record now clear that Johansson did not perform general manager duties, Johansson's objections to the motion to compel arbitration rest on the argument that the arbitration provision is part of an agreement related to a *real estate agent* position, which is distinct from his *recruiter* job. But this argument runs headlong into Johansson's version of the facts. Johansson insists that he never intended to serve as a real estate agent and never in fact assumed that role. See, e.g., Supplemental Johansson Decl. ¶¶ 6–10; Johansson Dep. 43:4–10, 91:15–19. But if that is so, how could the agreement be intended to cover anything other than his position as a recruiter? Johansson alleges that he only ever entered into one agreement with Central Properties and testified that his job duties did not change after the independent contractor agreement was signed. See Johansson Dep. 145:3–16. The logical conclusion is that the independent contractor agreement, notwithstanding its reference to a "sales associate," was intended to cover the one and only employment relationship Johansson and Central Properties

8

entered into. This dispute—which centers on Johansson's compensation for services rendered under that relationship—clearly "arises out of" that agreement.

Even if the Court construes the independent contractor agreement to apply to a real estate agent position that Johansson says he never held, it still concludes that Johansson has failed to present positive assurances that this dispute is beyond the scope of the arbitration clause. For one, the text of the independent contractor agreement does not explicitly exempt these claims, in contrast to its express exclusion of other kinds of disputes. See Mem. P. & A. Supp. Defs.' Mot. Compel Arbitration Ex. A, at ¶ 8 (exempting, *inter alia*, wrongful death suits or small claims court suits). Moreover, the phrase "arising out of" is a broad one. See, e.g., Invista North America S.À.R.L. v. Rhodia Polyamide Intermediates S.A.S., 503 F. Supp. 2d 195, 206–07 (D.D.C. 2007). The underlying merits of Johansson's claims—whether he was to be compensated with a salary or solely through commissions—are clearly intertwined with the employment relationship set forth in the independent contractor agreement, regardless whether Johansson's duties included sales or simply recruiting other brokers. Given this interconnection, the arbitration clause is clearly "susceptible of an interpretation that covers the dispute." Woodroof, 147 A.3d at 787–88.

Finally, Johansson's focus on what terms are missing from the agreement—such as any term related to pay—implicates issues that fall within the arbitrator's purview under the severability doctrine. What impact the absence of a term related to Johansson's salary or the omission of any discussion of his recruiter duties from the written independent contractor agreement has on its enforceability is thus for the arbitrator to address in the first instance.

In sum, Johansson has failed to provide positive assurances that his claims fall outside the scope of the arbitral agreement, particularly in light of the factual record and Johansson's

9

position that he only ever had a single working relationship with Central Properties. Under D.C. law, the Court must construe any ambiguities in favor of arbitration.

C. Arbitration of Johansson's claims against Paul Sliwka

Johansson further argues that even if his claims against Central Properties should be arbitrated, those against Defendant Paul Sliwka are not subject to the agreement and arbitration. The Court disagrees. "Under the doctrine of estoppel, a signatory to an arbitration agreement may be compelled to arbitrate with a non-signatory when the non-signatory is seeking to resolve issues that are intertwined with an agreement that the signatory has signed." Fox v. Computer World Services Corp., 920 F. Supp. 2d 90, 103 (D.D.C. 2013); see also, e.g., Kelleher v. Dream Catcher LLC, 278 F. Supp. 3d 221, 225–26 (D.D.C. 2017). Johansson raises the same claims against Sliwka that he does against Central Properties and seeks damages against both defendants jointly and severally. See Compl. ¶¶ 27–49. As such, the claims against Sliwka are sufficiently intertwined with the agreement Johansson made with Central Properties to fall within the doctrine of estoppel.

* * *

At the end of the day, Johansson and Central Properties both intended to enter into an employment relationship. As part of that relationship, Johansson signed an employment agreement with a binding arbitration clause. District of Columbia law requires the Court to enforce that arbitral agreement.

For the foregoing reasons, it is hereby

**ORDERED** that [9] Defendant's Motion to Stay Case and Compel Arbitration is GRANTED. It is further

**ORDERED** that this case be stayed while the parties undergo arbitration. It is further

**ORDERED** that the parties file a joint status report every 90 days commencing November 27, 2018.

**SO ORDERED**.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>August 29, 2018</u>